FOSTER MACHINE CO *v.* COVEL MANFG. CO.

1. FRAUD—CONTRACTS—SPECIAL KNOWLEDGE—RIGHT TO RELY ON INFORMATION IMPARTED.

   Where two parties are about to enter into a contract, and one of them has special knowledge regarding facts and matters about which the contract is to be made, and conveys such knowledge to the other, such other has the legal right to rely upon such information in making the contract, and is under no obligation to investigate to discover the fraud.

2. SAME — LIABILITY FOR FALSE INFORMATION IRRESPECTIVE OF FRAUDULENT INTENT.

   Where plaintiff, who was engaged in the manufacture of a certain machine and had knowledge of the weight thereof, contracted with defendant for the manufacture of a certain number of said machines and represented the weight to defendant to be much less than it actually was, plaintiff was liable to defendant, who relied on said information, for the difference in value, irrespective of whether or not such information was imparted with the fraudulent intent to thereby injure and deceive defendant.

3. SAME—EXECUTED CONTRACT—REMEDIES OF PARTY DEFRAUDED.

   One who has been fraudulently induced to enter into a contract and after its execution discovers the fraud, may at once rescind the contract and bring an action to recover what has been paid thereon, or he may affirm the contract and bring an action to recover damages for the fraud.

4. SAME—EXECUTORY CONTRACT—FRAUD AFFIRMED BY COMPLETING CONTRACT AFTER FRAUD DISCOVERED.

   Where a party who has been fraudulently induced to enter into a contract discovers the fraud while the contract is as yet wholly executory, and, with full knowledge of the fraud, proceeds to complete the contract, he thereby affirms the fraud.

5. SAME—DISCOVERY OF FRAUD—EVIDENCE—SUFFICIENCY.

In an action involving defendant's right to recover damages from plaintiff for fraudulently inducing defendant to enter into a contract, evidence *held*, insufficient to establish that defendant had such knowledge of the fraud before the completion of the contract that it can be said that it affirmed the fraud.

6. SAME—KNOWLEDGE OF FRAUD BY SHIPPING CLERK NOT KNOWLEDGE OF EMPLOYER.

Knowledge by defendant's shipping clerk of the true weight of the machines during the execution of the contract was not such knowledge of defendant as would affirm the fraud of plaintiff in misrepresenting the weight thereof when the contract to manufacture same was entered into; the clerk being a servant rather than an agent.

7. SAME—SECOND CONTRACT—RIGHT TO RELY ON INFORMATION IMPARTED IN MAKING FIRST.

Where defendant entered into a second contract for the manufacture of machines before any had been manufactured under the first contract, and before the fraud as to misrepresentation in weight had been discovered, it had a right to rely on the information imparted by plaintiff and recover for the fraud upon both contracts.

8. SAME—DAMAGES—MEASURE OF DAMAGES.

Defendant's measure of damages for the fraud in misrepresenting the weight of the machines was the total difference in pounds multiplied by the reasonable value per pound of castings of this nature during the period covered by the contracts involved.

Error to Berrien; White (Charles E.), J. Submitted April 28, 1922. (Docket No. 25.) Decided July 20, 1922.

Assumpsit by the Foster Machine Company against the Covel Manufacturing Company for money paid by mistake. Defendant pleaded recoupment for fraud. Judgment for defendant. Plaintiff brings error. Affirmed.

*John J. Sterling* and *William E. Wider,* for appellant.

*Humphrey S. Gray,* for appellee.

CLARK, J. The cause was tried without a jury. There was judgment for defendant which plaintiff reviews on writ of error. As to both fact and law, we adopt the opinion of the trial judge:

"This is an action in assumpsit to recover the sum of $2,336.92, which plaintiff claims to have overpaid the defendant by mistake, on account of two certain contracts by which defendant was to manufacture for plaintiff 200 plain head screw machines. The defendant admits the over-payment of said amount through mistake. It sets up, however, by way of recoupment, that defendant was induced to enter into said contracts by the fraud and misrepresentations of plaintiff, relative to the weight of said machines. It appears from the evidence that the plaintiff was for some time before the making of the contracts engaged in the business of manufacturing and placing upon the market these screw machines, together with other machinery. It also appears that the defendant is engaged in the business of making special machinery.

"The plaintiff, having orders for more machinery than it was possible for it to build in its factory in Elkhart, Indiana, sought to secure the building of additional machines under contract in some other factory. Negotiations to that end were opened with the defendant, which finally resulted in the plaintiff and defendant entering into a contract in writing for the manufacture by defendant for plaintiff of one hundred No. 4 plain head screw machines, on August 24, 1915. Before this contract was formally entered into, a good deal of correspondence passed back and forth between the parties relative to the making of the contract. During the negotiations, and before the contract was signed, Mr. E. C. Filstrup, president of defendant corporation, went to the plaintiff's place of business at Elkhart, Indiana, for the purpose of having a personal interview with the officers of plain-

tiff corporation regarding the matter of the contract and on that occasion talked the matter over with Mr. Foster, who was then president and in charge of the business of plaintiff corporation. The details of the making of the contract, and what would be required of defendant in manufacturing the machines, appears to have been discussed at length and quite fully between Mr. Foster and Mr. Filstrup. I am advised from the evidence that at the time he had the interview with Mr. Foster that Mr. Foster supplied him with the circular which was introduced in evidence, and known as circular C 6, and which circular is specifically referred to in the contract of August 24, 1915. This circular contains the statement that the net weight of the No. 4 plain head screw machines was 1,800 pounds. So far as the evidence discloses, neither Mr. Filstrup, nor any one connected with defendant corporation or its business, had any previous knowledge of these machines. On the other hand, it was a machine which the plaintiff had long manufactured, and plaintiff was, consequently, thoroughly acquainted with the details and weight of the machine.

"At the time of the meeting in Elkhart, Indiana, Mr. Foster also agreed to supply Mr. Filstrup, from the records of the Foster Machine Company, with certain time cards, showing the time required by plaintiff to build one of the machines. Mr. Filstrup then returned to Benton Harbor and he, together with the superintendent of defendant's factory, having before them the plaintiff's time cards, the circular C 6, blueprints and specifications of the machine, and other information supplied by plaintiff, made the figures to determine at what price they could afford to build these machines, offered to build the machines for the sum of $340 a machine.

"The contract of August 24, 1915, for the building of the first 100 machines was accordingly entered into between plaintiff and defendant. This contract, as I have said before, specifically refers to the circular C 6 and contains the language 'Complete exactly as shown on circular C 6.' It was also agreed by the plaintiff that, as soon as it could do so, it would build one of these machines in its own factory and ship the same to defendant at Benton Harbor, Michigan, so that defendant might have such machine as a model

from which to build the other machines.  This model however, was not shipped to the defendant until quite a long time thereafter.

"On November 12, 1915, another contract was entered into with the plaintiff and defendant, by the terms of which defendant agreed to build an additional 100 machines for the plaintiff for the sum of $372 each.  If I remember the testimony correctly, at the time this latter contract was entered into, plaintiff had not as yet supplied defendant with the model and, consequently, at that time defendant had not built any one of the machines.

"The circular C 6 did not contain correct information relative to the weight of plaintiff's No. 4 machine. This circular describes the machine as weighing net, 1,800 pounds, whereas, it is admitted by all parties connected with the case that the true net weight of such machine, as built, both by plaintiff and defendant was 2,600 pounds.  Plaintiff has explained this discrepancy by saying at the time this circular was issued it was changing the bed pan on said machine; that the bed pan on the machine which plaintiff had always manufactured was a cast iron pan, and that this bed pan was about to be changed to a pressed steel bed pan which would reduce the weight of the machine from 2,600 to 1,800 pounds; that these circulars were being printed to be used for a long period of time in the future, and consequently, described the weight of the machine with the pressed steel bed pan. The machine that defendant was to build, however, had a cast iron bed pan, conforming to the old pan.  And it does not appear that plaintiff called defendant's attention to this change, in fact, it could not have done so, as plaintiff denies all knowledge of having furnished defendant with circular C 6, which has been introduced in evidence.  I am satisfied however, that plaintiff must have provided the defendant with this circular previous to the signing of the contract of August 24, 1915, as otherwise a contract would hardly have been entered into between the parties making specific reference to the circular if defendant had not been theretofore supplied with a copy of such circular.

"Defendant claims that at the time the contracts of August 24, 1915, and November 12, 1915, were

entered into with plaintiff, it supposed that such machines would only weigh 1,800 pounds each; that plaintiff supplied defendant with such information (through circular C 6) and the plaintiff had a right to rely upon it. I am satisfied from the evidence that plaintiff did supply defendant with this information, and that defendant relied upon it. In the first place, plaintiff was thoroughly familiar with the weight of this machine because it had long manufactured it. On the other hand defendant had no such information. Neither was there any model which defendant could inspect and examine prior to the making of the contract. It would be strange indeed if defendant would enter into a contract for the manufacture of those machines without having some information as to its weight and the amount of material necessary to manufacture one of the machines.

"In the second place, defendant has offered in evidence memorandum of the original figures by which Mr. Filstrup and defendant's superintendent arrived at the price at which they could reasonably afford to build the machines for. This original memorandum shows that defendant, in making the bid, was figuring on a machine to weigh 1,800 pounds. Such information could have only come to the defendant through plaintiff, and therefore I am fully satisfied that the weight of the machine was furnished to defendant by plaintiff, and that defendant relied upon such weight in making the contract with the plaintiff. Defendant's superintendent who assisted Mr. Filstrup in figuring on the contracts quit defendant's employ soon thereafter, and after that Mr. Filstrup himself acted as defendant's superintendent.

"These contracts were fully completed, and the 200 machines finished and shipped some time in the summer of 1916. As the machines were completed in defendant's factory, they were crated and marked plainly with shipping directions on the crates. The net weight of such machine, that is to say, 2,600 pounds, was also marked in large letters on each crate. This was done either by defendant's shipping clerk or under his immediate direction. As these machines were shipped from time to time, copies of the bills of lading therefor, containing the weight of the machines, were retained by defendant's shipping clerk

and placed among his files.    It appears that Mr. E. C. Filstrup, defendant's superintendent, during the time these machines were being built and shipped, was from time to time about the factory where the work was being done, but he denies all knowledge of the fact that he knew, or had his attention called to the weight of the machines as they were being manufactured and shipped.    There is no direct evidence in the case that he had such knowledge, except as the court might draw the conclusion that he had from the fact that he was superintendent of the factory and as such was from time to time about the place where the work was being done.

"This matter was apparently closed on the books of both parties about the time the work was completed, and until some time early in February, 1917. At that time the plaintiff, in the usual course of its business, caused audit to be made of its books, through which it was discovered that it had overpaid defendant on account of said contracts the sum of $2,336.92.    It at once called the matter to defendant's attention, and asked for repayment of that amount.    This resulted in several letters passing back and forth between the parties.    It also caused defendant to make an examination of its records and books relative to these contracts and their fulfillment.    It was then discovered by defendant, as it claims, for the first time, that these machines weighed as manufactured 2,600 pounds instead of 1,800 pounds. Defendant thereupon immediately demanded payment from plaintiff for additional weight of the machines.

"I think it is abundantly established by the evidence as I have above stated, that defendant, in making these contracts, relied on plaintiff's representations relative to the weight of the machines.    I have no doubt that plaintiff, though innocently and with no intention to defraud, supplied defendant with the information. There can be no question but what defendant was deceived and injured thereby.    Had the defendant the legal right to rely upon this information in figuring upon these contracts and in determining the price at which it could reasonably afford to contract with plaintiff for the manufacture of the machines?    In my judgment it had.

"As a general proposition of law, where two parties

are about to enter into a contract, and one of the parties has special knowledge regarding facts and matters about which the contract is to be made, and conveys such knowledge to the other party, the other party has the legal right to rely upon such information in making the contract.    14 Am. & Eng. Enc. Law (2d Ed.), p. 120; *Busch* v. *Wilcox*, 82 Mich. 315; *Eaton* v. *Winnie*, 20 Mich. 156 (4 Am. Rep. 377); *Nowlin* v. *Snow*, 40 Mich. 699.

"The party defrauded is under no obligations to investigate to discover the fraud.    *Smith* v. *Werkheiser*, 152 Mich. 177 (15 L. R. A. [N. S.] 1092, 125 Am. St. Rep. 406); *Vanelli* v. *Littlejohn*, 172 Mich. 91.

"In this case the plaintiff possessed all of the knowledge regarding the weight of this machine completed, and defendant possessed no knowledge on that subject, and was in no position to acquire such knowledge excepting through plaintiff.    Plaintiff did not even have on hand a model machine which defendant could inspect.    In addition to this, I am satisfied from the evidence that it is an established custom among the manufacturers of machinery to rely on the information regarding the weight of the machines given by the party who is to have the machines manufactured.

"It necessarily follows, from what I have stated, that the information regarding the weight of the machines was given defendant by plaintiff; that such information was wrong and false; that defendant was deceived thereby, and induced thereby to its injury to enter into the contracts in question.    In this State it does not matter whether the information was imparted with the fraudulent intent to injure and deceive the defendant.    If the information was in fact given by plaintiff, if it was false in fact, and was relied upon by defendant and defendant had a right to rely upon it, and it was injured thereby, it amounts to a legal fraud.

"The next important question to be considered is whether or not the defendant discovered the fraud which had been practiced upon it by plaintiff before the completion of the contracts, and notwithstanding such knowledge, proceeded to fully carry out the contracts, and is by virtue of such conduct now barred

from setting up the fraud as a defense to this action.  Defendant's counsel, in his brief, assumes that such knowledge makes no difference.  He assumes that it is wholly immaterial whether or not the fraud was discovered by defendant after the execution of the contracts, but before their completion.  I cannot agree that this position is a sound one in law.  The authorities cited in defendant's brief in support of his position, all have reference to executed contracts. There is no question but that one who has been fraudulently induced to enter into a contract, and discovers after its execution the fraud, may pursue two remedies.  He may at once rescind the contract and commence action to recover what has been paid thereon, or, he may affirm the contract and sue to recover damages for fraud.  This doctrine however, has no application to a case where the contract is wholly executory at the time the fraud is discovered. If a party to a contract discovers the fraud which has been practiced upon him to induce him to enter into the contract during the time when the contract is as yet wholly executory, and with full knowledge of the fraud, proceeds to complete the contract, he thereby affirms the fraud.  To hold otherwise would enable the defrauded party after the discovery of the fraud to greatly enhance his damages.  We do not believe that any court would hold to such a rule of law.  20 Cyc. p. 92; *Kingman* v. *Stoddard*, 29 C. C. A. 413, 85 Fed. 740; *Simon* v. *Goodyear*, 44 C. C. A. 612, 105 Fed. 573 (52 L. R. A. 745).

"In fact I have been unable to find a single case or authority which holds that a party to an executory contract, with full knowledge of the fraud that has been practiced upon him, may proceed to execute the contract and not affirm the fraud.  However, before it can be said that a party to an executory contract affirms the contract by proceeding to execute it, it must clearly appear that he has full knowledge of all the facts and circumstances establishing the fraud. 2 Cooley on Torts (3d Ed.), p. 965.

"In view of this rule of law, can it be said under the facts existing in this case, that the defendant has affirmed the fraud which was practiced upon him?  We do not think that it can.  The evidence is not clear and convincing that the defendant had

such full knowledge of the fraud before the completion of the contract as it can be said it affirmed the fraud by executing the contract. Mr. Filstrup denied all knowledge of the weight of the machine as manufactured until long after the completion of the contracts. The court would not be justified, from this record, in concluding that he had such knowledge merely from the fact that he had the opportunity of acquiring it. In fact, to my mind, the very letters passing between the parties in February, 1917, which are relied upon by plaintiff, as indicating such knowledge, are strong proof that no such knowledge existed on the part of Mr. Filstrup. If he had such knowledge, he would at once have called plaintiff's attention to the difference between the weight of the machine as represented and as actually manufactured when the correspondence started. On the contrary, he does not appear to have raised the question until after the correspondence caused him to make an investigation of defendant's books and records regarding these contracts, and he then discovers the fraud and calls plaintiff's attention to the same.

"No other officer, agent or employee of defendant appears to have had, during the execution of the contracts, any knowledge that the machine weighed 2,600 pounds net, excepting the shipping clerk. We do not think that the knowledge of the shipping clerk, under these circumstances, can be imputed to the defendant to the extent that it can be legally said that the defendant had such full knowledge of the fraud while it was executing the contracts as would affirm it. Many authorities have been cited by plaintiff to the effect that the knowledge of the agent of a corporation is the knowledge of the corporation, when such knowledge is acquired in the usual course of the agent's employment. We do not believe that this principle has any application to the case. The shipping clerk in this case was not an agent of the defendant in the true sense of the word, and such as is contemplated by the authorities cited. He was rather a servant of the defendant.

"It is also suggested in plaintiff's brief that the fraud, if any was practiced, could only have reference to the first contract. I cannot adopt this view for

the reason that it appears that the relation of the parties was the same when the second contract was entered into as when first was entered into. In the meantime defendant had not gained any additional information relative to the weight of the machine, and it must be said that he relied upon the information regarding the weight of the machine imparted to it by plaintiff as much when the second contract was entered into as before; it had not as yet started to make any of the machines, at least none had been completed, and, as I remember the testimony, the model to be supplied by plaintiff had not yet been provided.

"I conclude, therefore, that defendant is entitled to recover against plaintiff a judgment for the amount of damages which it has suffered by reason of the fraud practiced upon it by plaintiff. The measure of defendant's damages is the difference between the value of the castings in 200 machines weighing 1,800 pounds each and 200 machines weighing 2,600 pounds each. The total difference in pounds is 160,000. The evidence discloses that the reasonable value of castings of this nature during the period covered by the contracts involved was three and a quarter cents per pound. The defendant is therefore entitled to recover as damages against the plaintiff the sum of $5,200. Deducting from this the sum of $2,336.92, which it is admitted plaintiff has overpaid defendant, the defendant is entitled to a judgment. (To which by stipulation interest was added making the sum for which judgment was entered $3,370.12.)"

Judgment affirmed.

FELLOWS, C. J., and WIEST, McDONALD, BIRD, SHARPE, MOORE, and STEERE, JJ., concurred.